# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# ST. LOUIS DIVISION

| | |
|---|---|
| THE ASSOCIATION OF EARLY CHILD CARE EDUCATORS, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| | ) Case No. |
| DR. MARGIE VANDEVEN, in her official capacity as the Missouri Commissioner of Education, | ) ) ) ) |
| DR. TRACY HINDS, in her official capacity as Deputy Commissioner of the Missouri Department of Elementary and Secondary Education, Division of Learning Services, | ) ) ) ) ) ) |
| and | ) ) |
| DR. PAM THOMAS, in her official capacity as the Assistant Commissioner of the Missouri Department of Elementary and Secondary Education, Office of Childhood. | ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COMES NOW the Association of Early Child Care Educators (the "Association"), by and through undersigned counsel, and for its Complaint for Declaratory and Injunctive Relief against Dr. Margie Vandeven (the Commissioner of the Missouri Department of Elementary and Secondary Education ("DESE")), Dr. Tracy Hinds (the Deputy Commissioner of DESE's Division of Learning Services), and Dr. Pam Thomas (the Assistant Commissioner of DESE's Office of Childhood) (collectively, "Defendants"), in each of their official capacities, states as follows:

## INTRODUCTION

1. As widely reported, the State of Missouri is experiencing a severe child care crisis that is reaching a dire inflection point. Nearly half of the children in Missouri under the age of five, approximately 202,000 children, live in what is commonly called a "child care desert"—a geographic area where only one in three children have access to a licensed child care facility. This crisis has been exacerbated by the COVID-19 pandemic that brought unprecedented disruptions to child care and early childhood education, and led several child care facilities across the State to close their doors.

2. According to DESE, since 2021, approximately 1,377 child care facilities have closed.

3. But the child care crisis in Missouri has disproportionately affected the most vulnerable and underserved children and families across the State, including in the St. Louis region. Indeed, thirty-six percent of the child care facilities that have shuttered since 2021 served a disproportionate share of "subsidy-eligible children"—that is, children of families whose income does not exceed eighty-five percent of the State's median income.

4. The Association comprises approximately 13 licensed child care providers that have served subsidy-eligible children, among other populations of children, throughout the St. Louis area for decades. Indeed, several members of the Association have served children in the St. Louis area for over 20 years.

5. The Association's members rely on funding from the Child Care Development Fund (the "Fund")—a state-federal partnership under the Child Chare and Development Block Grant Act (the "Act")—to provide child care to vulnerable children in the St. Louis area.

6. Specifically, members of the Association and other child care providers receive additional funding by way of "rate enhancements" or "differential rates" for providing services to,

among other underserved populations, a disproportionate share of subsidy-eligible children and children with special needs. The provision of these additional funds accords with the Act's requirement that Missouri "give priority for services . . . to" children from low-income families, children with special needs or who are part of vulnerable populations, children experiencing homelessness, and children "of families in areas that have significant concentrations of poverty and unemployment." 45 C.F.R. § 98.46.

7. Under the Act, each participating state must designate a "Lead Agency" responsible for administering the Fund in accordance with a "Child Care and Development Fund Plan" ("State Plan") that must be submitted to and approved by the United States Department of Health and Human Services ("DHHS"). *See* 42 U.S.C. § 9858b; 45 C.F.R. § 98.10.[1] Once DHHS approves a State Plan, Lead Agencies have a legal obligation to abide by the terms of the plan. *See* 45 C.F.R. § 98.93(a).

8. DESE is currently the Lead Agency for Missouri. Missouri's Division of Social Services ("DSS") administered the Fund as the State's Lead Agency from 1990 until 2021.

9. Historically, in Missouri, the State Plans have provided for the following differential rates or rate enhancements:

    (a)    25% rate enhancement for serving children with special needs;

    (b)    15% rate enhancement for maintaining nontraditional or extended hours of operation;

---

[1] Under certain governing regulations, a State Plan must, among other things, describe "how the State will develop and implement strategies . . . to increase the supply and improve the quality of child care services for: (i) children in underserved areas; (ii) infants and toddlers; (iii) children with disabilities, as defined by the State; and (iv) children who receive care during nontraditional hours." 42 U.S.C. § 9858c.

3

  (c)  20% rate enhancement for child care providers who obtain accreditation from a recognized state accrediting agency and

  (d)  30% rate enhancement for serving more than 50% subsidy-eligible children.

10. Since 2012, Missouri's State Plans have required that these rate enhancements be "stacked" or tiered—meaning members of the Association and other child care providers could cumulatively receive *all* rate enhancements for which they qualified.  And, up until September of 2023, Missouri's State Plans have been administered such that each rate enhancement is "stacked."

11. But in September 2023, in the midst of the child care crisis and the expiration of federal pandemic-related emergency child care funding, Defendants incorrectly determined, without any basis to do so, that the 2022-2024 Child Care and Development Fund Plan for Missouri (the "2022 State Plan"), that became effective on July 1, 2022, does not allow the rate enhancement for providing services to a disproportionate share of subsidy-eligible children to be stacked or administered cumulatively with certain other rate enhancements in the 2022 State Plan.

12. By refusing to stack all the rate enhancements, Defendants are violating the terms of the 2022 State Plan and have unlawfully withheld federal subsidies to members of the Association.

13. In short, Defendants submitted to DHHS—and DHHS approved—a 2022 State Plan that required stacking of the differential rates.  In failing to administer the 2022 State Plan in accordance with its terms, Defendants are violating federal regulations and have caused the Association's members severe financial harm.

14. What is more, Defendants' actions have and will continue to severely impact children from low-income families and children "of families in areas that have significant concentrations of poverty and unemployment"—the same populations Defendants promised the

4

federal government it would prioritize in its administration of the 2022 State Plan.  Indeed, several child care providers in the St. Louis area are in danger of closing their doors due to funding issues, and at least one child care facility has already closed due to Defendants' violation of the 2022 State Plan.

15. The Association brings this action for declaratory and injunctive relief.

## PARTIES

16. The Association of Early Child Care Educators is a professional organization representing approximately 13 licensed child care providers in the St. Louis area.

17. Defendant Dr. Margie Vandeven, the Missouri Commissioner of Education, is the state official that leads DESE.

18. Defendant Dr. Tracy Hinds is the Deputy Commissioner of DESE's Division of Learning Services, which oversees DESE's Office of Childhood.

19. Defendant Dr. Pam Thomas is the Assistant Commissioner of DESE's Office of Childhood, which among other things is responsible for administering the Child Care Development Fund, a federal and state partnership established by the Child Care and Development Block Grant Act of 1990, 42 U.S.C. § 9858, in compliance with implementing regulations, 45 C.F.R. § 98.1 *et seq*.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this case arises under federal law, including under 42 U.S.C. § 1983 and 45 C.F.R. §§ 98.90–93. *See Mo. Child Care Ass'n v. Cross*, 294 F.3d 1034, 1036 (8th Cir. 2002).

21. This Court has personal jurisdiction over Defendants because, in their official capacities as officials of DESE, they reside in Missouri.

22. Venue is proper in this Court because this Court has personal jurisdiction over Defendants in this district, so Defendants are "deemed to reside" in this district. *See* 28 U.S.C.§ 1391(b)(1), (c)(2).

23. Venue is further proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

24. The Association has organizational standing because:

   (a) The Association's purpose is, among other things, to advance and protect the interests of its member child care providers in receiving subsidies for which they are eligible;

   (b) Members of the Association would have standing in their own right because, as a direct result of Defendants' violation of the 2022 State Plan and federal law, they have been and continue to be denied access to federal funds and declaratory or injunctive relief would allow the Association's members to access the federal funds they are being denied;

   (c) The Association adequately represents the interests of its members in this case; and

   (d) At least one of the Association's members will suffer irreparable harm—closure of business—if it does not receive the relief requested herein.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**A.    Federal Law Authorizes the Child Care Development Fund.**

25. The Act is the principal federal law that authorizes the Fund, which is a federal and state partnership program funded by Congress, *see* 42 U.S.C. § 9858, but administered by state agencies pursuant to 45 C.F.R. § 98.1 *et seq*.

26. At the federal level, the Fund is administered by DHHS.

27. At the state level, DESE is the current Lead Agency responsible for administering the Fund by providing pass-through federal funding to child care providers who establish eligibility and meet certain requirements.

**B.     The Purpose of the Federal Funding.**

28. The Act's express purpose is, among other things, to "increase the number and percentage of low-income children in high-quality child care settings." 42 U.S.C. § 9857(b)(7).

29. The Act's implementing regulations further require that each participating state's Lead Agency "shall give priority for services provided" under the Act to "Children of families with very low family income," "Children with special needs," "Children experiencing homelessness"; and "shall prioritize increasing access to high-quality child care and development services for children of families in areas that have significant concentrations of poverty and unemployment." 45 C.F.R. § 98.46.

30. It is intended that "a substantial portion of the amounts available" under the Act be "used to provide assistance to low-income working families." 42 U.S.C. § 9858c(c)(3)(D).

**C.     Requirements of the Act – The State Plans.**

31. In order to apply for federal funds under the Act, DESE must submit a State Plan for DHHS approval every two years. 45 C.F.R. § 98.13(c).

32. As one of many requirements to receive federal funding, each State Plan must "describe how the State will develop and implement strategies . . . to increase the supply and improve the quality of child care services for: (i) children in underserved areas; (ii) infants and toddlers; (iii) children with disabilities, as defined by the State; and (iv) children who receive care during nontraditional hours." 42 U.S.C. § 9858c(c)(2)(M).

33. Additionally, each State Plan must "describe the process the State proposes to use . . . to give priority . . . to children of families in areas that have significant concentrations of poverty and unemployment and that do not have such programs." *Id.* at § 9858c(c)(2)(Q).

34. DESE, and DSS before it, has prioritized these populations by providing eligible child care providers "rate enhancements" or "differential rates" for services provided—that is, DESE provides a percentage increase over the base rate paid by the State for serving certain populations of children.

35. The Act expressly permits rate enhancements to be part of a State Plan. *See* 42 U.S.C. § 9858c(c)(4)(C) (allowing states to provide differential rates based on a number of factors, including "geographic location," "the age or particular needs of children," services being provided during "nontraditional hours," and "the State's determination that such differentiated payment rates may enable a parent to choose high-quality child care that best fits the parent's needs.").

36. Missouri's State Plans have historically provided for the following differential rates or rate enhancements:

    (a)    25% rate enhancement for serving children with special needs;

    (b)    15% rate enhancement for maintaining nontraditional or extended hours of operation;

    (c)    20% rate enhancement for child care providers who obtain accreditation from a recognized state accrediting agency; and

    (d)    30% rate enhancement for serving 50% subsidy-eligible children.

37. Under the terms of Missouri's State Plans, DSS and now Defendants have been required to "stack" the rate enhancements, meaning child care providers receive each rate enhancement for which they qualify.

38. For more than a decade, DSS and now Defendants have actually administered the State Plans such that all rate enhancements "stack"—that is, every rate enhancement was cumulatively available to qualifying child care providers.

39. The 2012-2013 State Plan explicitly acknowledged that each rate enhancement was "cumulative," providing, "[r]ate enhancements are cumulative, so in effect, if eligible for the 30% disproportionate share enhancement and the 20% accreditation enhancement, a provider would receive a 50% enhancement to their base rate." DSS administered these rates cumulatively according to the State Plan's requirements.

40. The 2014-2015 State Plan contained the same differential rates as the 2012-2013 State Plan. It provided:

> A full range of providers are available to families receiving child care subsidy through the rate differentials offered to providers. Parental choice offers families the ability to access licensed, licensed exempt and registered family/neighbor providers. Approximately 70% of children served in through child care program are in licensed child care facilities. Licensed providers caring for 50% or more state subsidized children receive a 30% disproportionate share rate differential added to their base rate. For example, while the licensed child care center base rate ceiling stands at the 38th percentile at $27.52 per day, with this 30% differential the rate would increase to $35.78. The 75th percentile equates to $50.00. Providers who become accredited receive a 20% differential to their base rate. Providers who provide evening and weekend care receive a 15% differential to their base rate. Providers serving special needs children receive a 25% differential to their base rate, which is child specific.

41. Although the 2014-2015 State Plan did not use the word "cumulatively," the differential rates were administered cumulatively or "stacked" in accordance with the requirements of the 2014-2015 State Plan.

42. The 2016-2018 State Plan also included the same differential rates or rate enhancements as previous state plans. It provided:

> Child care rate enhancements over their base rate are available to child care providers for those that provide services to a child with special needs (25%), have obtained accreditation by an accrediting organization recognized by the Lead

9

> Agency (20%), **and/or**, if licensed, provide care for a disproportionate share (a minimum of 50% of the total number or children in their care) of children receiving child care assistance from the Lead Agency (30%).

(2016 Plan at 152 (emphasis added).)

43. The 2016-2018 State Plan also provided a 15% rate differential for providing services during non-traditional or extended hours of operation.

44. The phrase "and/or" in the above-quoted language of the 2016-2018 State Plan indicates that the rate enhancements in the 2016-2018 State Plan were cumulative rates that were required to be "stacked." *See Copeland v. Zimmerman*, 271 S.W.2d 513, 515 (Mo. 1954) ("[T]he commonly accepted meaning of the phrase 'and/or' is 'Either *and* or *or*.'").

45. Although the 2016-2018 State Plan did not use the word "cumulatively," the differential rates were administered cumulatively.

46. The 2019-2021 State Plan provided the same differential rates for: (1) maintaining non-traditional or extended hours of operation; (2) serving children with special needs; (3) being accredited; and (4) for serving a disproportionate share of subsidy-eligible children.

47. Although the 2019-2021 State Plan did not use the word "cumulatively," the differential rates were administered cumulatively in accordance with the State Plan's requirements, just as had been done for the 2012-2013 State Plan, the 2014-2015 State Plan, and the 2016-2018 State Plan.

48. The 2022 State Plan contains the same four rate enhancements that were available under the 2019-2021 State Plan: a 25% rate enhancement for providers that serve children with special needs; a 15% rate enhancement for providers who operate during nontraditional or extended hours of operation; a 20% rate enhancement for being accredited or working towards accreditation (the "Accreditation Rate"); and a 30% rate differential for programs that are

accredited or working toward accreditation and that provide care to 50% or more subsidy eligible children (the "Accreditation / Disproportionate Share Rate").

49. The 2022 State Plan assured the federal government that DESE's goal as the Lead Agency was "to continue to increase rates" by offering "incentives . . . for weekend and evening care, accreditation, disproportionate share for serving 50% or more eligible subsidy children, and an incentive for serving special needs children results in a higher payment for providers."

50. Administering the rate enhancements cumulatively, as the State has done in each prior State Plan, would "result[] in a higher payment for providers" who are serving Missouri's most underserved children.

51. The 2022 State Plan is currently operative and governs Defendants' responsibilities to administer funds disbursed under the Act.

52. Under the 2022 State Plan, all differential rates or rate enhancements are required to be "stacked" and administered cumulatively.

53. Defendants administered these rates cumulatively until September 2023, when they inexplicably and unlawfully stopped doing so.

**D.    For the First Time in the History of the Fund in Missouri, Defendants Have Refused to Stack All Rate Enhancements, Resulting in a Violation of the 2022 State Plan.**

54. As stated, there are generally four differential rates or rate enhancements under Missouri's State Plans:  a rate enhancement for serving children with special needs; a rate enhancement for maintaining non-traditional hours; a rate enhancement for accreditation; and a rate enhancement for serving 50% or more subsidy-eligible children.

55. There is a separate application process and different criteria for eligibility for each rate enhancement.

11

56. Each member of the Association had to apply for each rate enhancement it sought to receive.

57. Prior to September 2023, members of the Association applied for both the Accreditation Rate and the Accreditation / Disproportionate Share Rate enhancements, among other rate enhancements available under the 2022 Plan.

58. In June and July of 2023, Members of the Association were approved for both the Accreditation Rate (20% rate enhancement) and the Accreditation / Disproportionate Share Rate (30% rate enhancement) enhancements.

59. After approval, members of the Association entered into agreements with DESE for each of the above enhancements.

60. At all relevant times herein, members of the Association have met and continue to meet the eligibility requirements for both the Accreditation Rate and the Accreditation / Disproportionate Share Rate enhancements.

61. On or around September 6, 2023, DESE sent letters to members of the Association advising that, effective October 1, 2023, members of the Association could not receive both the Accreditation Rate and the Accreditation / Disproportionate Share Rate, as those rates would no longer be "stacked."

62. Thus, for the first time in the history of any Missouri Lead Agency administering State Plans, it was determined that not all rate enhancements could be stacked or administered cumulatively.

63. Defendants' conclusion that the 2022 State Plan does not allow "stacking" of the Accreditation and Accreditation Disproportionate Share Rate is wrong and, in failing to administer the 2022 State Plan in accordance with its terms, Defendants have violated federal law.

64. Like all State Plans before it, the 2022 State Plan requires Defendants to stack all the rate enhancements and administer them cumulatively to eligible child care providers.

65. Defendants *actually* administered the 2022 State Plan by stacking the Accreditation Rate and the Accreditation / Disproportionate Share Rate for the entirety of the 2022-2023 fiscal year and well into the 2023-2024 fiscal year.

66. There is available funding for Defendants to continue to administer the rate enhancements in the 2022 State Plan cumulatively.

67. Members of the Association have suffered injury on account of Defendants' failure to disburse funds it agreed to disburse—and promised the federal government it would, in fact, disburse—to child care providers serving the neediest children.

68. Members of the Association will continue to suffer injury for future payment periods unless Defendants comply with their obligations under the 2022 State Plan.

**COUNT I – DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201 FOR VIOLATION OF 42 U.S.C. § 9858c; 45 C.F.R. § 98.56
(Against all Defendants)**

69. Plaintiff restates and reincorporates the allegations of paragraphs 1 through 68 of this Complaint.

70. Defendants, as officials responsible for overseeing DESE's implementation of the 2022 State Plan, are required to administer the 2022 State Plan in accordance with its terms as approved by the DHHS.  *See* 45 C.F.R. §§ 98.56(a)(1), 98.93(a).

71. A failure to administer the 2022 State Plan in accordance with its terms is a violation of the federal regulations that govern the Fund pursuant to the Act.  *Id.* § 98.93(a); *see also id.* at § 98.90 (permitting DHHS to audit Lead Agencies for compliance with approved Plans).

72. The Association's members are intended beneficiaries of DESE's receipt of federal funds under the terms of the 2022 State Plan.

73. Defendants are violating their obligations under federal law by failing to administer the 2022 State Plan as approved by the federal government—specifically, by failing to "stack" or administer cumulatively the Accreditation Rate and the Accreditation / Disproportionate Share Rate.

74. The Association seeks a declaratory judgment that the 2022 State Plan requires that the Accreditation and the Accreditation Disproportionate Share Rate be stacked or administrated cumulatively.

WHEREFORE, Plaintiff Association of Early Child Care Educators prays that this Court enter judgment in its favor and against Defendants as to Count I and grant the following declaratory relief:

a. Declare that Defendants, in their official capacities as officers of DESE, have an obligation under 45 C.F.R. § 98.93(a) to administer the 2022 State Plan according to its terms;

b. Declare that the terms of the 2022 State Plan require that all rate enhancements or differential rates, including the Accreditation Rate and Accreditation / Disproportionate Share Rate, be administered cumulatively or are "stacked"; and

c. Award the Association such other and further relief as this Court deems just and proper under the circumstances.

**COUNT II – INJUNCTIVE RELIEF UNDER 42 U.S.C. § 1983 FOR VIOLATING RIGHTS SECURED BY 42 U.S.C. § 9858c; 45 C.F.R. § 98.56
(Against all Defendants)**

75. Plaintiff restates and reincorporates the allegations of paragraphs 1 through 74 of this Complaint.

76. Defendants, as officials responsible for overseeing DESE's implementation of the 2022 State Plan, are required to administer the 2022 State Plan in accordance with the terms of the Plan as approved by DHHS. *See* 42 U.S.C. § 9858c(c)(3).

77. As part of their duties under Section 9858c, Defendants had an obligation to ensure that "the payment rates for the provision of child care services under this part are sufficient to ensure equal access, for eligible families in the area served by the Lead Agency, to child care services comparable to those provided to families not eligible to receive CCDF assistance." 45 C.F.R. § 98.45.

78. Members of the Association are child care providers who fall within the zone of interests that Section 9858c serves to protect.

79. Members of the Association are intended beneficiaries of the 2022 State Plan that DESE—under Defendants' control and oversight—caused to be submitted for approval by DHHS.

80. Because members of the Association have entered into agreements with DESE under which DESE agreed to disburse federal funds in accordance with the terms of the 2022 State Plan—namely agreements to receive both the Accreditation Rate and the Accreditation / Disproportionate Share Rate—the Association's members have a federally protected right to demand DESE's compliance with the 2022 State Plan.

81. Defendants' failure to administer the Accreditation Rate and the Accreditation / Disproportionate Share Rate cumulatively constitutes an ongoing violation of the Associations' members' federally protected rights.

82. Unless a court of competent jurisdiction enjoins Defendants to administer the Accreditation Rate and the Accreditation / Disproportionate Share Rate cumulatively under the

2022 State Plan, members of the Association will suffer two future harms: deprivation of federal funds to which they are entitled and an imminent cessation of operations.

83. Defendants' failure to administer the Accreditation Rate and the Accreditation / Disproportionate Share Rate cumulatively further violates the child care providers' rights to funds that ensure equal access for their students—who are disproportionately subsidy eligible—as compared to students who are not subsidy eligible. 45 C.F.R. § 98.45(a).

84. Unless a court of competent jurisdiction requires Defendants to administer the Accreditation Rate and the Accreditation / Disproportionate Share Rate cumulatively, as required in the 2022 State Plan, members of the Association are in imminent danger of shutting down for lack of sufficient funding.

85. The Associations' members' rights would be vindicated if a court of competent jurisdiction enjoined Defendants to administer the 2022 State Plan according to its terms and distribute federal funds as the 2022 State Plan requires, namely by stacking the Accreditation Rate and the Accreditation / Disproportionate Share Rate for eligible child care providers.

WHEREFORE, Plaintiff Association of Early Child Care Educators prays that this Court enter judgment in its favor and against Defendants as to Count II and grant the following injunctive relief:

    a. Enjoin Defendants to administer the Accreditation Rate and the Accreditation/Disproportionate Share Rate enhancements cumulatively for eligible members of the Association;

    b. Award Plaintiff its costs and reasonable attorney's fees; and

    c. Enter such other and further relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

**LEWIS RICE LLC**

DATED:  February 12, 2024

By: /s/ Jerina D. Phillips
Jerina D. Phillips, #65103MO
Kolten C. Ellis #74451MO
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
Telephone:  (314) 444-7600
Facsimile:  (314) 612-7600
jphillips@lewisrice.com
kellis@lewisrice.com

*Attorneys for Plaintiff*